SOUTHWESTERN TELEGRAPH & TELEPHONE CO. v. RIGGS. (No. 7652.)

(Court of Civil Appeals of Texas. Galveston. Feb. 14, 1919. Dissenting Opinion Filed and Rehearing Denied Oct. 30, 1919.)

1. TELEGRAPHS AND TELEPHONES ☞66(4) — SUFFICIENCY OF EVIDENCE TO AUTHORIZE RECOVERY FOR DISCONNECTING PHONE.

Evidence *held* to support verdict of $250 for vexation, annoyance, and inconvenience caused plaintiff subscriber by reason of his telephone being wrongfully disconnected by defendant company.

2. TELEGRAPHS AND TELEPHONES ☞71—EXCESSIVE RECOVERY FOR DISCONNECTING PHONE.

Verdict of $250 for vexation, annoyance, and inconvenience caused plaintiff subscriber by reason of his telephone being wrongfully disconnected by defendant company *held* not so excessive as to show passion or prejudice.

3. APPEAL AND ERROR ☞688(2)—ASSIGNMENT AS TO ARGUMENT NOT SHOWN BY RECORD OVERRULED.

Assignment with reference to argument of counsel will be overruled, where there is nothing in the record to show any such argument as complained of, though there is a statement in motion for new trial that such argument was made.

Pleasants, C. J., dissenting.

Appeal from District Court, Harris County; Charles E. Ashe, Judge.

Suit by H. P. Riggs against the Southwestern Telegraph & Telephone Company. Judgment for plaintiff, and defendant appeals. Affirmed.

John Charles Harris, of Houston, for appellant.

Ellis P. Collins, of Houston, for appellee.

LANE, J. This suit was brought by appellee, H. P. Riggs, against appellant, the Southwestern Telegraph & Telephone Company, to recover damages in the sum of $1,500.20.

Among many other things, appellee, Riggs, in substance alleges that on the 12th day of July, 1917, for the consideration of the sum of $4 paid by him to the telephone company, said company contracted with him to place a telephone in his residence and to give him local telephone service for the term of two months from said 12th day of July, 1917; that notwithstanding said contract, and payment made by him, the telephone company negligently, wantonly, maliciously, and oppressively had his telephone disconnected from its telephone line and discontinued giving him service for a term of three days just prior to August 8, 1917; that at such time he was the creditman for a large business firm in the city of Houston; that on the 8th day of August he had arranged to go to Madisonville, Tex., on a business trip; that about one hour before his train was to leave for Madisonville he tried to talk to his wife over the telephone so as to inform her that he was going to Madisonville; that by reason of said act of appellant in cutting out his phone he was unable to talk to his wife, and therefore did not make his trip to Madisonville, as he had intended to do; that, when he undertook to talk to his wife, he was told that his service had been discontinued because he had not paid his phone bill; and that others were informed that he had not paid his bill. He also alleged that by reason of the negligent, wanton, and malicious act of appellant aforesaid, its refusal to reconnect his phone, and the mistreatment of him by appellant company, he suffered humiliation, annoyance, and inconvenience to his damage as follows:

"(1) For remission of contract price, 20 cents. (2) Humiliation, annoyance, and inconvenience, and mental distress to plaintiff, $250. (3) Humiliation, annoyance, and inconvenience, and mental distress to wife of plaintiff, $250. (4) Damage to plaintiff's reputation, and his distress because of same, $500. (5) Exemplary damages, $500."

For all of which he prayed judgment.

The defendant telephone company answered by general denial, and specially averred that—

"When the plaintiff, Riggs, made his cash payment of $4 to defendant company on July 12, 1917, such cash payment was promptly noted by the cashier's office on a stub it placed on a spindle file in such a manner that accidentally the needle of the spindle ran through the figure 8 of plaintiff's telephone number, which was 'Capitol 1928,' making the figure 8 very much resemble the figure 3, and that thereupon plaintiff's cash payment was accidently credited to telephone under 'Capitol 1923'; that this de-

fendant sincerely regrets the occurrence of such accident, and now here tenders to plaintiff, in open court, the 20 cents rebate claimed by plaintiff."

It further alleged that the plaintiff was guilty of contributory negligence in not notifying defendant that his phone had been discontinued until the lapse of three days after such disconnection was made; at which time he, for the first time, made complaint to defendant.

The contract payment for two months service, from the 12th day of July, by plaintiff, and the disconnection of his phone and discontinuance of his phone service, is admitted by appellant.

Plaintiff, Riggs, testified as follows:

"My name is H. P. Riggs. I am credit manager of the Deutser Furniture Company. I have charge of all the allowances of credit for that company. I am married. I have a telephone in my residence here in Houston. The number is Capitol 1928. The phone was installed on July 12, 1917, and the amount represented by the receipt that has been introduced was paid on the day said phone was installed.

"After the phone was installed, I got proper service from the defendant company for a time. On August 8, 1917, I was at my place of business, the Deutser Furniture Company, and I attempted to call my wife. I called her at Capitol 1928. She was at that number, and I was at the store. When I tried to get that number, Central told me that the phone had been temporarily disconnected. In reply to that I asked her why. She says: 'I will refer you to the cashier.' I said: 'All right. Let me talk to him.' Then the cashier, of course, answered the phone, stating that that was the cashier's office. I told the cashier that I had been informed by the operator that my phone had been disconnected, and I wanted to ascertain why such was the case. He asked me if I had paid my phone bill. I told him: 'You ought to know. You keep a record of such matters, don't you?' He said: 'Well, let me see.' He went and referred to his books and said that their records showed that I owed $3.25. I told him that that was wrong, that I had a receipt, that the phone had only been installed less than a month, and that I paid for two months in advance. He says: 'Will you bring that receipt down here?' I told him that I was very busy; I could not bring it down, and that it was imperative that I talk at once. He said: 'Well, we cannot do anything for you until you bring the receipt down here.' I was actually busy at the time. That was about 9 o'clock in the morning; I would not say positively the time. The cashier told me that I would have to bring the receipt down there, and I told him that I did not have time to come down there, and that I was very busy, and that they should know whether I paid the bill or not, and if he wanted to see the receipt I had it, but I did not have time to come down there, and he said I would have to show him the receipt before he would connect my phone. The cashier seemed not to want to give me the service, so I told him it was very important business that I had to talk on, and must talk at once. I wanted to talk to my wife. He

said: .'Well, you cannot talk until you get your phone paid.' I said: 'Well, I can talk, too, because I have said to you that I have paid it, and I am going to talk, or I am going to find out why I cannot talk.' I said: 'Now, look here; if you don't connect my phone up in three minutes, there is going to be something doing down at the courthouse, because I have paid my bill as I have stated to you before, and I am entitled to this service.' When I said that, he said, 'Is that so?' and gave me the horse laugh. He laughed at me. Then I hung up the receiver.

"I then called my phone again within three to five minutes, somewhere along there, and asked for that number. Central told me the same thing as before; that it had been temporarily disconnected, and she would refer me to the cashier. I had already talked to him and told her I did not want to talk to the cashier, and that I wanted to talk to that number. She said: 'You cannot talk to the number. It is disconnected.' So it made me hot. I said I did not want to talk to the cashier, and she said 'I will refer you to the manager's office.' I said: 'All right, let me talk to the manager.' Then I got connection with the manager's office and talked to a young lady. I do not suppose she is the manager. I suppose she is a clerk in the manager's office. She asked me first: 'Why are you referred to the manager's office?' I told her that my phone had been disconnected, and I wanted to know why such was the case. I repeated the words that it had been temporarily disconnected, and she said: 'You should have been referred to the cashier's office, instead of being referred to my office.' I said: 'I have already been referred to the cashier's office, and I could not get any satisfaction out of it. He positively refused to connect my phone.' She said: 'Well, you would not expect it to be connected if you had not paid your bill, would you?' I said: 'But I have paid my bill, and told the cashier that I had.' And she made the same statement that he did, for me to come down and bring my bill down there. I told her I did not have time.

"After I had that conversation with the manager's office, I waited about 30 minutes, and called from another number, and they reported the same thing, and I did not go any further with it. That was my residence phone I was calling. I was so angry at the time they disconnected my phone I just wanted to find out if they were still doing that, and who else they might be telling that I had not paid my bill. After I did not try any more that morning. After central and the cashier and the manager's office had refused to connect my phone, I came over to see Mr. Collins, my attorney, and took steps to file suit.

"The effect on me, when they treated me in the way I have described, was to make me angry. I was running around there like a chicken with his head cut off, and I used some language that I would not like to use before these ladies. The biggest effect that it had on me at the time was from this standpoint: That I have always had an ambition to be a man of unquestioned integrity and unimpaired fidelity. I wanted to have that with every one. I have wanted each and every one to know that I had a soundness of moral principle and char-

acter, and the fact that I had not paid, or that they told me I had not paid the bill, was an insult to me at that time; and not only an insult. There may have been a ruffling of feelings, but, as I just said, I wanted a record which was scrupulously clean. I have not the words to express it, but I did not want anything that would hurt my reputation or name. I felt considerably hurt over the fact that they might be telling any and every one that called my place that I had not paid my bill. It certainly did ruffle my feelings; the cashier spoke so sarcastic and cold-blooded. I did not have a chance. He would not listen to any argument or reason, so to speak, just the cold-blooded way that they sometimes do when they know they have you where they can do you as they please. I think I have a good standing in the community. I know a good many people for the time I have been here. I have been in Houston a little over a year. I have been in business all that time. We came from Beaumont and opened up the house in Houston. I pay my bills. I quite frequently get business calls over the telephone, over my residence phone, quite frequently at night and Sundays."

Mrs. Retzer testified as follows:

"I have had occasion to call Capitol 1928. It was early in the morning. It was in the month of August. I was trying to get Mr. Rigg's phone. I did not really pay any attention to the time, but it was the early part of August, 1917, and it was early in the morning, between, I should imagine, 9 and 10. When I tried to get this telephone number, I got an answer that the phone was temporarily disconnected. That was all Central told me."

G. B. Bell testified that he was the cashier and head bookkeeper for appellant, and in charge of its records; that appellee Riggs had paid $4 to the company on the 18th day of July, 1917, for the rent of his residence phone and for local service for two months; that this $4 was inadvertently credited to local phone No. 1923, instead of to appellee's phone No. 1928; that it is a general rule of the company that, where a subscriber calls up and claims that his bill is paid, they turn the service on and investigate afterwards, even if the books of the company do show that the bill is not paid; that this was the verbal instruction of the manager at Houston and that such instruction had been generally followed; that it takes 20 or 30 minutes to make such connection; that it might be done in 10 minutes. He testified that the company's telephone line was the only telephone line in Houston, and that appellee could only get telephone service from this company; that none of the employés complained of have been discharged; that the company approved of the acts of said employés in this matter. Testifying further, he said:

"I am acquainted with practically all of the facts of this case. I first learned that this telephone was cut off about 8 o'clock on the morning of August 8th. I learned it that morning just as soon as the gentleman got through talking to Mr. Arnim, the assistant in my office. Mr. Arnim talked to me about it right away. Mr. Arnim talked to me and I talked to him. Mr. Arnim simply said that he had a telephone connected up, and that was correct. I talked with Mr. Arnim that very morning."

He testified further that, when Central tells one that the phone of a subscriber is temporarily disconnected, that means the subscriber's bill is unpaid; that they do not tell people that the phone has been temporarily disconnected under any other circumstances; that those circumstances are only when the company claims the bill is not paid. Testifying further, he said:

"The paper that counsel for the defendant now hands me is a receipt stub, what is called a cash stub. It shows that Mr. Riggs paid his $4, just like the receipt that he introduced shows. The slip that is now shown me shows that this amount of $4 was credited to Capitol 1923, and said slip is the bookkeeper's transfer, debiting the number that this amount was credited to, and crediting the number that it should have gone to, which was Capitol 1928. It shows the credit was applied wrong, and we corrected it by debiting the wrong number and crediting the right number. The bookkeeper made these entries. This slip is one of the regular records of my office, and I am the head bookkeeper, and am in charge of the records."

Continuing, he said:

"About 9 o'clock in the morning of August 8th, I went to look up this credit. Mr. Riggs said that he had paid the account, and we went over to our accounting department to look up this cash credit, and found that they did not have any credit on that date. He said he had paid it on July 11th or 12th. So we went back to that day's cash, and got the original stubs out of that day's cash, and showed it was posted to 1923 instead of 1928. When the clerk collected this account, she put this slip on a spindle, and after it was taken off the spindle it goes from my office to the bookkeeper to post on his credit ledger. I did not find it on the spindle; it was in a file. I do not know who has had it since the time I found it in the file; but I expect Mr. Harris, our attorney, has had it. The paper which is now shown me is the bill rendered against Mr. Riggs on August 1, 1917, for phone Capitol 1928, for exchange service for August, 1917, $2, and for service from July 12, 1917, to August 1, 1917, $1.25, a total of $3.25, showing that the account had not received credit for the $4. Said account was sent out on August 1st."

The foregoing facts are relied upon by appellee for a recovery.

The cause was tried before a jury upon special issues submitted by the court as follows:

"Special Issue No. 1. Did the plaintiff by reason of his telephone being disconnected suffer any annoyance or inconvenience? Answer yes or no.

"Special Issue No. 2. If you have answered the foregoing issue in the affirmative, and only in that event, you will answer this question: What amount of money do you find would

reasonably compensate plaintiff for the annoyance and inconvenience suffered, if any?"

The verdict of the jury was as follows:

"We, the jury, answer the special issues submitted to us herein as follows:
"Answer to special issue No. 1: Yes.
"Answer to special issue No. 2: $250.00."

Upon the evidence and verdict of the jury, the court rendered judgment in favor of appellee against appellant for the sum of $250.20. From this judgment the telephone company has appealed.

[1] By appellant's assignment No. 1, it is insisted that the only damage shown by the evidence was for the 20 cents sued for, and that there was no evidence to support a recovery of $250 for annoyance and inconvenience, and that the verdict of the jury is contrary to the evidence and against the weight of the evidence.

While laboring under some doubt as to the correctness of our conclusions, the majority of this court feels constrained to hold that the assignment should be overruled. The evidence shows that on the 12th day of July, 1917, appellee paid appellant $4 for rent of his residence phone and for service for two months from that date, and that appellant had on said date made a written contract with appellee to furnish such service for the sum paid. It shows further that, within less than one month after the phone was placed in appellee's residence under his contract, appellant cut it out and discontinued his service, and, when appellee complained of his reckless and wrongful treatment and requested to be given service, he was told that his account or bill was unpaid and that his phone would not be reconnected until he paid his account, although he told them he had paid his bill. The fact that appellee had paid for two months' service was well known to appellant, or with the slightest thought would have been known to it, because it was known to appellant by the contract in its possession that appellee's phone had been installed on the 12th day of July, less than one month, and it was well known to appellant that such phone would not have been so installed unless appellee had paid a certain sum in advance, still with this knowledge, as evidenced by the account rendered, it in violation of its rules had his phone disconnected, and he and those who desired to talk to his residence were in effect told that his service had been temporarily discontinued because he would not pay his phone bill, and, after being told by appellee that he had paid his bill, he was refused reconnection until he had been vexed, annoyed, and inconvenienced, and until he had threatened to sue to recover his rights. It is also shown that appellee, by reason of such treatment, was very much vexed and annoyed, and, believing that he could not get his rights without resort to law, employed an attorney to force appellant to perform its contract.

Appellant's head bookkeeper, G. B. Bell, testified that about 9 o'clock, about 30 minutes after appellee had been refused service (and after appellee had intimated that he would sue the company), he went to look up the credit of appellee and in a very short time found the error. Why, may we ask, did not he, with all the data in his possession, look up this credit before the phone of appellee was cut out and he was refused the service for which he had paid? Does not the conduct of appellant's employés in this matter show a reckless disregard of the feelings and rights of appellee? We can conceive of no sound reason why compensation for injuries which cannot be accurately estimated, such as mental distress, vexation, and annoyance, or such as are commonly spoken of as offenses to the feelings, insults, and indignities, should not be allowed. It is a legal maxim that every legal wrong entitled the party injured to recover damages sufficient to compensate him for the injury inflicted.

In the case of Cumberland Telegraph & Telephone Co. v. Hobart, 89 Miss. 252, 42 South. 349, 119 Am. St. Rep. 702, the Supreme Court of Mississippi used the following language:

"When the telephone company undertakes to cut out their subscribers for debts which they claim to be due them, they may do so if the subscriber actually owes them, but if the subscriber is not indebted to them they are liable in damages to the subscriber for such actual damage, inconvenience, and annoyance as is occasioned him by wrongfully cutting out his telephone.

"The damage sustained by the loss of a telephone in its very nature is largely composed of inconvenience and annoyance. That a person deprived of the use of a telephone is materially damaged, all will concede. What is the amount of damage in dollars and cents cannot be accurately stated by the party suing for the reason that his damage consists not only in pecuniary losses, but it consists in inconvenience, discomfort, and annoyance, and it must be left to the jury to determine what is the damage sustained, taking into consideration the discomfort, the annoyance and inconvenience suffered, together with actual pecuniary losses. Would it be contended if one's gas is wrongfully cut off that compensatory damage would be only what it would cost to buy tallow candles? To so hold, and to hold that annoyance, discomfort, and inconvenience was not a proper element of damage to be considered by a jury when the service of a telephone has been wrongfully discontinued, would be to place the public at the mercy of the telephone company, and force them to yield to many unjust demands rather than contest, for fear of a discontinuance of the service. Such coercive powers cannot be sanctioned.

"We would unhesitatingly set aside a verdict of the jury where the amount allowed was grossly excessive or unreasonable, but we shall be slow to interfere with their judgment when

it is not so. The telephone may be considered a necessary household utility, so much so that the thought of losing it will coerce almost any one into payment of any debt claimed within reason rather than have it cut out. It is a public service corporation without competition, monopolistic in nature, and the patrons have no choice but to accept its service, and they have not the privilege of selecting to do business with a competitor because there is no competitor, and for this reason the rights of the public should be carefully guarded against oppressive methods used for the purpose of collecting unjust demands. The necessities of the law must meet modern conditions."

We can see no good reason why appellee should not be compensated for the vexation, annoyance, and inconvenience suffered by him by reason of the wrongful acts of appellant.

[2] By the second assignment insistence is made that the verdict of the jury and judgment of the court is so excessive as to indicate prejudice on the part of the jury against appellant.

In Ruling Case Law, vol. 8, § 215, p. 673, the following rule is announced:

"In actions sounding in damages merely, where the law furnishes no legal rule for measuring them, the amount to be awarded rests largely in the discretion of the jury, and unless so large as to indicate that it was the result of passion, prejudice, or corruption, or that the evidence has been disregarded, their verdict is conclusive and will not be set aside as excessive, either by the trial court or on appeal. Full compensation is impossible in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation, and so all that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, that the results attained do not shock the judicial conscience. The courts will of course interfere with the verdicts of juries when it is manifest that they are the result of corruption, prejudice, or passion; and so it is the province of the court to set a verdict aside where it clearly appears to be excessive, or where the jury in rendering it appear to have disregarded the testimony. The amount awarded must bear some reasonable proportion to the injury sustained. However, since it is for the jury and not for the court to fix the amount, a verdict will not be set aside merely because it is large, or because the reviewing court would have awarded less."

The reasoning in the case of Cumberland Telegraph & Telephone Co. v. Hobart, supra, here copied, is applicable to the question here presented, to wit:

"The damage sustained by the loss of a telephone in its very nature is largely composed of inconvenience and annoyance. That a person deprived of the use of a telephone is materially damaged, all will concede. What is the amount of damage in dollars and cents cannot be accurately stated by the party suing for the reason that his damage consists not only in pecuniary losses, but it consists in inconvenience,

discomfort, and annoyance, and it must be left to the jury to determine what is the damage sustained, taking into consideration the discomfort, the annoyance, and inconvenience suffered, together with actual pecuniary losses."

[3] The fourth assignment is overruled. There is nothing in the record to show that any such argument as complained of was made by counsel for appellee. We are asked to consider the assignment upon the mere statement made in the motion for new trial that such argument in fact was made, without anything in the entire record to support the same.

What has been said disposes of all of appellant's assignments, and it is apparent therefrom that the majority of this court have reached the conclusion that the judgment of the trial court should be affirmed, and it is so ordered.

Affirmed.

PLEASANTS, C. J. (dissenting). The holding of the majority of the court that appellee, upon the facts of this case, is entitled to recover damages from appellant for "annoyance and inconvenience" caused by reason of his telephone having been wrongfully "temporarily disconnected" by appellant, is in my opinion an unreasonable extension of the scope of the law of damages, and is without support in the authorities.

All of the material evidence in the case is correctly copied in the opinion of the majority. The facts established by this evidence may be briefly stated as follows:

Appellant, thinking that appellee had not paid his residence phone rent for the previous month, disconnected his phone on the 5th day of August, 1917. A bill for this rent and also for the rent for the month of August was sent to appellee on August 1st. Appellee had in fact paid the rent for the phone for two months in advance when he had it installed in his residence in July. The clerk or employé of appellant who received the money from appellee and issued the receipt therefor placed the duplicate or memoranda of the receipt on a file book in the office. Appellee's phone was No. 1928 and the receipt given him was for that number. In placing the duplicate or memorandum on the file, the hook pierced the center of the figure 8, and when the bookkeeper entered the item in his book he mistook the mutilated 8 for a 3 and credited the amount to phone No. 1923.

Appellee did not discover that his telephone was disconnected until the morning of the 8th of August, when, desiring to talk with his wife from his place of business, he called up the central telephone office and asked to be connected with his residence phone, and was informed that the phone was disconnected because the books of the company showed that he had not paid rent due for the phone. A detailed statement of the dis-

pute that then occurred between appellee and the employé of appellant is set out in full in the opinion of the majority and will not be repeated. After this dispute had ended, the telephone company made an investigation of its records, discovered the mistake, and reconnected the telephone. The exact length of time the phone remained disconnected after appellee informed the company that he had paid his bill is not shown, but the evidence warrants the conclusion that it was less than one hour.

Appellee, having paid his rent, was entitled under his contract to the use of the phone, and appellant should be held liable for any actual damage he may have sustained by being deprived of its use, and the fact that the wrongful act of appellant in disconnecting appellee's phone was due to an honest mistake that might easily occur in the keeping and rendition of accounts in any large business cannot affect this liability. But in the absence of malice, damages for breach of contract are only recoverable in law as compensation for actual or substantial loss or injury.

The $250 damages awarded appellee by the verdict and judgment in this case was for "annoyance and inconvenience" suffered by him "by reason of his telephone having been disconnected." There is nothing in the evidence tending to show that appellee sustained any loss or damage by reason of his failure to talk with his wife. The petition alleges that he wanted to tell his wife that he was going out of the city for the day, and that because of his inability to talk with her over the phone, he abandoned his trip. We are not informed as to the importance or purpose of his proposed trip, and the annoyance and inconvenience caused him by its abandonment must have been of no consequence because the matter is not referred to in his testimony.

Appellee does not claim in his testimony that he was annoyed or inconvenienced by not being able to talk with his wife over the telephone during the hour or less that the phone remained disconnected after he asked for the connection. He says he was made very angry by the treatment he received from the telephone employés and their refusal to accept his statement that the rent had been paid and reconnect the phone without requiring him to show his receipt; that, "he was running around like a chicken with his head cut off, and used language that he did not like to use before those ladies." There was nothing insulting in the language used by any of the employés in discussing the matter with appellee. He says that, when he told the cashier that if he was not given the connection in three minutes there would be something doing at the courthouse, the cashier laughed at him. The only bad temper that seems to have been shown in the entire controversy was displayed by appellee.

Any self-respecting man dislikes to have his statements of fact questioned, but it would hardly be contended that the feelings of resentment which might reasonably result therefrom is an injury for which damages are recoverable, and no such element of damage was submitted to the jury in this case. There was no evidence of malice on the part of appellant's employés, nor of such gross negligence as would amount to a willful wrong, and the issue of exemplary damages is not in the case.

Such being the evidence, it is not surprising that the majority of the court are "laboring under some doubt of the correctness of their conclusion" that appellee is entitled to recover of appellant $250 damages for having his phone disconnected for not exceeding one hour. While the phone was disconnected for three days, appellee did not know that it was disconnected until he attempted to talk with his wife on the morning of August 8th, and there can be no claim that he suffered any annoyance or inconvenience because of the phone being disconnected prior to the time that he attempted to talk with his wife. He could not suffer annoyance or inconvenience from being unable to use the phone, when he had no occasion to use it and did not know that it was disconnected. He claimed a remission of the rent of the phone for three days, and this sum appellant admitted was due him and paid the amount into court. This, in my opinion, is all that appellee is entitled to recover.

The case of Telephone Co. v. Hobart, 89 Miss. 252, 42 South. 349, 119 Am. St. Rep. 702, cited in the opinion of the majority, falls far short of sustaining the conclusion reached in that opinion. In that case the plaintiff Hobart was wrongfully deprived by the defendant for three or four months of the use of the telephone which it had contracted to furnish him. The evidence showed that Hobart suffered much annoyance and inconvenience by being deprived of the use of the phone. The evidence showing the annoyance and inconvenience suffered by him, as set out in the opinion, is as follows:

"Mr. Hobart claims to have been damaged in many ways by the removal of the telephone, but that it is difficult to enumerate the exact amount, and the ways in which he was damaged; that he lived out in the country, and that it was an almost indispensable adjunct to his household, and yet difficult to enumerate in dollars and cents; that when he was in town and wanted anything he could telephone; when he wanted to send things home, he was in the habit of putting them on the car and telephoning some one at the house to meet the car and get the things; after the telephone was cut out he could not do this, but had to send a boy; that he suffered inconvenience and annoyance in ways too numerous to name, and too difficult to put in dollars and cents and that the telephone was a necessity to him. He used the telephone on his place in Louisiana, and he

used it as a matter of convenience to talk home. While he was without the telephone, he was taken sick, and suffered great annoyance and inconvenience in not having a telephone in his house; that, to his recollection, he spent $25 to $30 for messengers to send things home; that, when he had long-distance calls several times, he would have to go out at night to his neighbor's house to talk, and, when his family was sick, he was put to much inconvenience, and deprived of the protection which the telephone gave him at his house."

Upon these facts the Supreme Court of Mississippi held that a verdict for the plaintiff for $150 was not so excessive as to authorize the court to set it aside.

I have no doubt that a telephone company that wrongfully denies a subscriber the use of a phone to which he is entitled can be made to respond in damages for the annoyance and inconvenience suffered by the subscriber by being deprived of use of the phone, but I do not think the evidence in this case shows that appellee was caused annoyance or inconvenience by being unable to talk with his wife on the occasion of which he testified. As before stated, he does not say in his testimony that he was inconvenienced or annoyed by not being able to talk with his wife. His only complaint is that he felt insulted and humiliated by the refusal of the telephone company to reconnect his phone when he informed it that the rent was paid.

I think the judgment of the court below should be reformed and affirmed, allowing appellee to recover only the rents paid by him for the phone for the three days it was disconnected.